is based on new evidence generated in two other cases. One, a Louisiana tax abuse case, which we call the Kempec case, and the other one is a Canadian parallel case to this. In your complaint, Mr. Dunner, do you allege anywhere that Dow as a company was aware of any supposed fraud that was being perpetrated? We do allege that, Your Honor. And I don't know that I can give you a number, but that will come very shortly. My colleagues will give that to me. We have allegations that Dow was aware. For example, we have... You've got evidence here at best of inconsistent testimony. Pardon? At best, you've got evidence that there's inconsistent testimony between the testimony that was given in this proceeding and that was given in another proceeding. Why does that rise to the level of fraud? I don't understand the cases that support the notion that mere inconsistency is evidence of fraud. Your Honor, the test is the Trump leak test. We have to make out a plausible case, and we do make out a plausible case. Well, how does it make out a plausible case of fraud? Because we have a situation where there are multiple elements to it. We have a situation where a Dow counsel consistently said on the question of whether or not all U.S. patents were transferred, consistently said they would not have been transferred en masse because they would lose rights in doing it. We have, in the Louisiana case, we have a witness, Valenzuela, who was in the tax department at Dow, who was responsible for computing royalties both under the Chemtech agreement and under the subsequent agreement involving the 2002 contribution agreement. We have a situation where we have an agreement summary form, which was never given to us in the Delaware case, even though discovery asked for it, which basically shows that Valenzuela... But Valenzuela says, as I recall his testimony, he says, I think so. Right? Your Honor, at first he said, I think, but he repeated himself, he was asked repeatedly, and he said everything. He said all. We cite that in our brief, where he actually was examined further and made it absolutely clear that it is much more than I think. Yeah, but even if he said more than I think, that wasn't an issue in the tax case as to whether the transfer occurred in 2002. I've looked at the tax case. That's not the issue there. In other words, this was testimony that was collateral to the issue in the tax case. Right? Your Honor, the issue was a tax abuse based on... No, no, answer my question. It wasn't directly involved. The question of whether that transfer was made was not directly an issue in the tax case. Right? The 2002 contribution agreement was not directly involved in the tax case. That is right. But what I'm saying is, his testimony was highly relevant to this case because he said that at the end of 2001, which was exactly when the 2002 contribution agreement was formed and came into being, January 1st, 2002, he said at that time, all of the Dow patents, U.S. and foreign, he didn't distinguish between the two, were contributed to a holding company, which ended up being the same company to which the earlier contribution was made, 68 high-value U.S. patents in the Louisiana case. And this agreement summary form ties the two together. It basically says that this agreement supersedes the prior contribution agreement between the initials for Dow and Diamond Tech, which was the holding company, dated April 30th, 1993. Valenzuela was a copy recipient of this document. Isley, who was the associate general counsel, was a recipient of it. Mr. Dodd, however you pronounce it, who was in charge of the Delaware litigation. What we are saying, and we allege... Because they insisted, they all insisted, these people in-house knew what was being said in both cases. They knew that what was being said in the Delaware case was that we wouldn't do it, and they knew that what was being said in the Louisiana case was, we did it all. They're quibbling about the difference between all and substantially all, but the supplement, the Schedules B supplement, which was the key document in Dow One, had 70, there were 7,300 U.S. patents, and that document only listed four. Now, all these people, all we need to do is make out a plausible case. We don't have to prove our whole case. We have to make out a plausible case. Of fraud. Of fraud. When you've got people saying, the people at the very least in-house, and the lawyers in-house, satisfy the fraud on the court test, and fraud on nobody doesn't require it. Let me ask you some questions about the Canadian case, Mr. Tarrant. I'll start with the one I improvidently asked you before, about Suarez, and the question of where in the record he said the separation was clean. Where is that? Where he said it was clean? He said he didn't get, in Canada, he said he didn't get a clean cutting off. In the United States, he said, he actually isolated, I can give you the size, 21082-84, in the amended complaint, paragraphs 111 to 117, which is what we're focusing on. And he said, he actually isolated the alleged component B, that they used to establish infringement. He said he had done tests on it. He said the separation was easy. He said all those things, and that's in the paragraphs I just gave you. In Canada, he said exactly the opposite. He said he didn't get a clean cutting off. He said he didn't believe at any time that his trap technique, which is the technique he used, could separate blended materials with similar crystallization properties, and that to do so is, quote, perhaps impossible. I really don't understand. This is so confusing, this second example of inconsistency. You know, you didn't put on an expert witness to explain why the two statements were inconsistent, and it doesn't seem to me, on the face of it, that they necessarily are. And, you know, I just say that so that you can try to explain it more clearly, but it's not clear to me that there's an inconsistency there. In one proceeding, the samples were contaminated, so he had a problem. So what? You know, and then he says the statement you just read about crystallization, which doesn't seem to be necessarily the same thing that he was trying to do in the action that we're dealing with here. Your Honor, the inconsistency is that in Canada, he said he didn't believe that the trap technique could separate these materials. And in Delaware, he said he actually isolated them. No, I don't think he said that the trap technique couldn't separate the materials. He said that it couldn't do this in relation to crystallization. I don't understand what he's talking about, but it's not that clear an inconsistency. Well, Your Honor, when you say he didn't say it, I have quotes around my notes. Well, where does he say that you can't separate the two? Because that's what he was saying in this action. I didn't see a clear statement to that effect. And while you're at it, Dow claims that Canadian testimony addressed the CDVI test, not separation of HDF. I want to know if that's true. Your Honor, we point out in the CDVI test, I can answer that very briefly. Will you forgive me, Judge Sykes? Oh, I think they're okay. I think we're asking the same question. Yeah. Uh... He says in the Canadian... The Dow cites relate, they give you cites, A30167 and 68, and they do not relate to CDVI, they relate to TREF. In other words, they're at that attorney argument, and when you look at the cites, I submit they relate to TREF, which is exactly what Dr. Soares was using. Well, maybe so. But what he said in the other actions, I changed my mind. I think co-crystallization for some type of situation, very difficult to get, CD, TREF, perhaps impossible, I think, to get it. I have no idea what he's saying there, where he talks about co-crystallization. What are you reading? There's a JA22748. I changed my mind. I think co-crystallization for some type of situation, very difficult to get, CD, TREF, perhaps impossible, I think, to get it. I have no idea what he's saying by that, or why that's inconsistent with what he said here about the separation of the pits. The appendix is a statement that he couldn't do it. I want the appendix. The appendix? Your Honor, the notes that I have indicate we are talking – well, I had it a second ago – 111 and 117, and I'm trying to find out where it is.  I'm reading from the amended Complaint 120, which is at 21084, which says pretty much what I said. Dr. Sawyers further testified in the Canadian action that he didn't believe at any time that the TREF technique he used could separate blends of materials that have similar crystallization properties, and that to do so was perhaps impossible. This is irreconcilable with his testimony of the jury in the Delaware case that he, in fact, actually separated off the HDF and that it was relatively easy to do so. This testimony – well, it goes on. So, all I'm saying is we're relying on the amended complaint, and the issue is does the amended complaint set forth a plausible case which might justify going forward and getting discovery? And all I'm saying is the entrenchment issues involving Dr. Sawyers and the – am I cutting you off? Well, I just don't understand how you can allege a case of fraud based on sort of testimony which is pretty incomprehensible on the face of it. I mean, I understand the first thing. There does seem to be an inconsistency with respect to the witness' testimony in the tax case in here, but with respect to the second one, I'm just not following. I don't understand. I mean, I look at the testimony, and it seems to me it's not clear on its face that it's even inconsistent. Your Honor, did you say you can see the difference in the all versus not all? Is that your point? I'm saying with respect to the witness in the tax case. In the tax case. I can understand that there's an apparent inconsistency, but I'm telling you that in the second example, the Sawyers testimony or whatever it is, I look at the testimony. I look at what he said in one case and what he said in the other case, and I don't – it's not apparent to me on the face of it that there's a necessary inconsistency. Let me answer you this way, Your Honor. I think there is an inconsistency, but if you don't, I've given you the inconsistencies, and you and your colleagues have to decide whether they're inconsistent or whether it amounts to the level of fraud. All I'm saying is, even if we exclude that, what happened in the tax case versus what happened in Delaware, diametrically opposed. The key corporate people knew what was going on in both cases. We allege expressly that they did so with fraud, with fraudulent intent. They were involved – they ended up hiding from us until we found it in the Canadian suit. This key document, this agreement summary form, which ties it all together, which shows which people were there, which people received the contribution agreement, which people were knowledgeable of what was going on in both litigations. We've got Isley, who was the associate general counsel. We have Simpson, who was a lawyer under him. We have Pinnock, who was in charge of the litigation, and Simpson, I guess, was in charge of the Delaware litigation. They knew what was going on. They permitted counsel to represent to the district court, to this court, to the Supreme Court, that they would not have transferred their U.S. patents because they might lose rights. And they ended up transferring only four in the Schedule B supplement, which I submit could not possibly be the correct Schedule A in light of the Valenzuela testimony. And while the district court judge said, I won't consider it because it's extrinsic, this court in Dow won considering the Kate Maxwell testimony to identify Schedule B supplement, and it was extrinsic evidence. The extrinsic evidence they wouldn't rely on was extrinsic evidence to determine whether Schedule A was controlling. It involved the interpretation of the agreement. We are not trying to reinterpret the agreement. All we're trying to do is show what was transferred and what was not transferred. And the Valenzuela testimony is inconsistent with what they said in this court and in Delaware and to the Supreme Court on the petition for cert. And all I'm saying is, when in-house counsel knows everything that's going on and has the left hand saying X and the right hand saying Y exactly opposite to X, that makes out a case of fraud. We're entitled to discovery to find out a lot more of the details, which we don't have on this issue. And Trombley makes it clear that all you need is a case plausible on its face and enough to get you to the point where you can get into discovery and get the detailed facts. Thank you. If you needed your time, we'll restore it two minutes after you bottle it if you need it. Please record. Can I first deal with the story's point? First of all, he never said it was a clean separation at all in the Delaware case. In fact, he testified in both Delaware and in Canada that he separated and isolated the HDF. So, in both cases, he gave the same kind of testimony. Yes, I separated and I isolated the HDF. Now, Mr. Turner said no, he didn't. He only said it in Delaware and then he changed his mind. But he didn't. The testimony is complete in both instances. We cited it in brief. In both instances, here in Canada, he said, here's the HDF. For that one, I don't have to do any reproduction. I can just separate it and isolate it and measure whatever properties I have to measure. So, he didn't. There's no inconsistency. If I can, Judge, you were asking Mr. Turner about the perhaps impossible. But, like at 31, not at 67 in the record, it's clear that he's talking about this other technique of CDBI, which does not involve any separations at all. What it does involve is whether- Well, we understand the testimony that I read from Mr. Donner to me where he says, I changed my mind. I think co-crystallization for some type of situation, very difficult to get CD-TREF, perhaps impossible. What's he saying? Okay, I'll try to explain that to you, my understanding of it. First of all, I changed my mind. Of course, it's got nothing to do with changing his mind between U.S. and Canada. I understand. It's an academic paper that he had published. What he's saying is that, for example, within the H- Let's say once you've separated the HDF, you've got this nice curve. And they were contending that one of the important properties was CDBI, composition, disposition, breadth index. So the question was, how accurate is CD-TREF? Not where you're separating it. CD-TREF in trying to distinguish between some of the very, very high-density molecules at the way at the high-density part of that thing. And he was saying, in some instances up there, you could have co-crystallization where even though one would theoretically think they should come out of different parts, they might, at those very, very high-density things, they might co-crystallize. So the test that you're relying on is not accurate all the times up there. But I can certainly separate the HDF. That separation occurs down here. So the two are entirely unrelated. And the fact of the matter is that in both the U.S. and Canada, where they admitted, finally admitted density at 0.93, the reason they admitted the density of 0.93 that Soares had measured for the HDF, because this phenomenon that he was talking about occurs at much, much higher densities. So they wanted to say, oh, the HDF is 0.93, so you don't have any such problem. And consequently, we don't have any problem with the CDBI test, which in both instances, both here and in Canada, was rejected as a relevant test. So what about the first example, where there seems to be an inconsistency between the Canadian tax proceeding and this proceeding in terms of the transfer? You know, I think at best... There is an inconsistency. At best, there's an inconsistency in the sense that this testimony, which had no relevance to that, and you already noted that, had no relevance to the case in Louisiana. He was saying, when did you stop calculating royalties? Well, I stopped calculating them when they transferred all the patents to this intangible holding company. So it was kind of like a... There was no discussion of schedule. It was just an offhand statement. Yes, when they transferred everything over there, I stopped my work. I mean, if that mattered, he wasn't doing it after that. So it was just an offhand thing. But why not, they say, why not let us have a deposition of this guy to determine whether there was something nefarious going on or it was just a mistake? Because the cases, Duhame, even Apotex, all the post-Fegarly cases say, you can't come in and bootstrap your case by just alleging an inconsistency and then say, you give me the discovery and I'll give you the fraud. That's not allowed in the post-Fegarly world. There's no case, they don't cite any. Mr. Rosenberg, let me back you up a little bit. Mr. Gunner, when asked about the account testimony, said, well, yeah, he said, I think. But then he was cross-examined and he was very specific that everything was transferred. Is that true? He didn't say, I think, every time he answered the question. But I think you're correct. The first time he said it, he said, I think that's what happened. I think later he just repeated it. He didn't happen to say, I think. That's the way he was thinking. Was he pressed on cross-examination? I mean, that's how Mr. Gunner characterized it. No, he was not pressed. It was not relevant to that proceeding. So it was just an offhand comment. And, in fact, they had the same kind of thinking and the same kind of thought in the actual Delaware case with Roger Schwartz when he was deposed. But there's no post-Bakerly case that I know of where you can come in and say, you know, here's an inconsistency. I want discovery to prove the fraud. If you give me the discovery, I'll go out and prove the fraud. In fact, I don't think there's a post-Bakerly case where an independent action even survives a motion to dismiss. But the point is, you can't come in and then start a big new, retry the case, in effect, on this issue, anyway, by saying I need discovery. And the progression of this case is, in the beginning, they said there was an en masse transfer and, consequently, his testimony is inconsistent with the interpretation of the contribution agreement. That went by the wayside. They gave that up. And then they said, okay, we'll accept the, of course, interpretation of the contribution agreement and the idea that you have to have a Schedule A. So they said, we agree you have to have a Schedule A. And Judge Starr said, you're saying you have to have a Schedule A? He said, yes. And then he said, and I've got one. He projected it. And he said, there it is. That's the Schedule A. That proves the fraud. And Judge Starr said, are you telling me that you have to prove up that Schedule A that you're relying on in order to satisfy your case? That's the only way you can do it? And he said, yes, that's exactly right. This sort of decides the point, I think. I mean, this is the 2009 Schedule A. Yes. Okay. I'm just saying that what they now say in their reply brief is they need discovery to go and find the so-called missing Schedule A that's going to prove their fraud case. And what I'm saying is the cases that I've seen, they say, no, that's not what an independent action in equity is. It's not a grave miscarriage of justice to have an inconsistency. Would that allow somebody to come in and say, no, I need discovery? It is an inconsistency. There is an apparent inconsistency there to some extent, although, frankly, I don't even think there's much of an inconsistency when you consider that he didn't really talk about Schedule A or the contribution agreement or what the mechanism was at issue for determining what patents to put on the thing, which, by the way, went from four to, I think, 300 and something by the time the relevant Schedule A that we're referring to actually came into being. But you can't come in. Doohane says that independent actions in equity are not, in view of the value of finality and determination, are not a mechanism for allowing discovery to be used to establish a fraud. You're showing a fraud. And you have to actually have it. In Hazel Atlas, which they cite repeatedly as an analogous to the case, I mean, they had everything before them. They had the evidence of the attorney producing or fabricating the document. They had the evidence of the payment for the scientist to publish it and say that it was his. I mean, that's fraud. That's not this inconsistency where you have a witness testifying in a case that was not highly cross-examined and say that, consequently, this case which was subject to discovery, which was subject to cross-examination of numerous people, they deposed or cross-examined three of the people who were the custodians of the schedules at Dow who explained exactly how they had been made. They had all that discovery. They had all that discovery. The woman who actually did the search for schedules had filed a declaration and they deposed her. So there is not the grave miscarriage of justice here that Begerle requires. And those cases say that. And, in fact, Haring, the Third Circuit case Haring, is very, I think, clear that a simple inconsistency, that's not enough. You've got to have something that is totally incapable of any other interpretation and it has to constitute fraud. So it is not enough and we submit that there is no case under the applicable authority. In that regard, let me point out that the Supreme Court in Begerle makes clear that an allegation of dispositive documents were withheld in earlier discovery in and of itself is not permissible. In other words, just because you withheld some documents that you now say should have been produced, that's not a grave miscarriage of justice. I mean, that's the kind of thing that the judicial system is assumed, presumed to be able to take care of. You have full discovery under the judicial system. You have cross-examination. And we take these things seriously. And you take the judicial process seriously enough to say that, yes, the judicial process is sufficient to allow people to try their cases and figure it out. And there has been no showing here that there's been any serious violation of that. So there is nothing of the grave miscarriage of justice that Begerle requires. And I think I answered everything on stories. Also, at best they have these things that are, well, they're not even inconsistencies. And I think that's fully explained in our brief. Okay. Thank you. I'd like to read from the amended complaint, paragraph 11, in response to a question that Judge Dyck asked me, which I didn't answer very well. It goes to the heart of the pleadings. And I submit it's enough under Twombly to go to the next page. As further set forth in detail below, Dow attained a judgment in the Delaware case through fraud. Morally, Dow, with the assistance of his in-house and outside counsel, engaged in a deliberate scheme to interfere with and defraud the trial and appellate courts in their adjudication of the Delaware case on the merits. First, to convince the court that it had standing, Dow falsely denied that it had in 2002 transferred its patents en masse, including its U.S. patents, to a subsidiary in a state tax avoidance scheme. Dow fabricated the story that it had generally withheld its U.S. patents for the transfer. To cover its deceit, Dow deliberately hid material evidence regarding the transfer, including the documents regarding the transfer that had been submitted to the executive committee of its board of directors, which exercised the powers of the board to manage Dow between meetings of the board. Second, on the merits of the infringement claims, Dow presented expert testimony that was, on information of belief, known to be false at the time it was given. The expert in question had admitted the true facts of the more recent related Canadian proceeding. Now, Twombly makes it clear that, and here's a quote, a plausible case on its face does not impose a probability requirement at the pleading stage, only calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary element, and the Third Circuit Wilkerson case cites that. We have cited, in spades, paragraph after paragraph, setting forth in detail the ABB Turbo case is kind of instructive, because there it was a motion to dismiss, and the court made determinations of the merits of the case at the pleading stage, and in ABB Turbo the court said that was improper, and I submit it's improper here. Is this a grave miscarriage of justice under Beverly? I submit it is. If, in fact, all the things that we allege in the cemented complaint are true, that is a grave miscarriage of justice to mislead three different courts, one of which is this court. As to Mr. Roper's comment that I made a statement that if the 2009 Schedule A is not the right one, then the case is over, I explained what I meant by that. He doesn't quote my later testimony where I explained exactly what I meant. If you look at A21-490, 21-491, 21-492, you will see that I explained that all of these documents, including Schedule B supplement, were post-suit. Every one of them was post-suit, and I said if there's a problem with one, there's a problem with all, and the point I was making was that Schedule B supplement couldn't possibly be the right one, given the evidence that we had, and the burden of proof is on them to prove standing in any event. As to whether we had discovery, the discovery we had certainly was not adequate in the light of the Valenzuela testimony, which we didn't know about at the time, and so I think we need discovery. I think we have made out a plausible case under Cromley. The pleading stage is not the time to deal with the merits of the case. We've made all the allegations, all the allegations we could possibly make, and those allegations are sufficient. And with that, Judge Wallach, you asked me for a cite on where Valenzuela said, He said that in the amended complaint at page 44, paragraph 44, 21061. Thank you. I do thank both Cromley and Ms. Casey.